Our last case on calendar today is WildEarth Guardians v. United States Forest Service. This is the one that has two lawyers on one of the sides. 23-35352. Each side has 20 minutes in this case. Thank you. Good morning, Your Honors. May it please the Court. My name is Zondreans Johanson. I represent the appellants in this matter. With the Court's leave, I'd like to reserve five minutes for rebuttal. I'd like to address two main points this morning, and then answer any questions the Court may have. The first point I'd like to address is the central question on appeal. Whether the Forest Service's 1995 national policy on the use of bait on national forests falls within the broad ambit of agency action under the Endangered Species Act. And second, I'd like to address new information that has come to light over the intervening three decades concerning the wider geographic distribution of grizzly bears, the undisputed significant overlap between where grizzlies now occur, where they did not occur in 1995 in Idaho and Wyoming, and instances of grizzlies being shot over bait in areas where they were not present in 1995. But first, I'd like to address, again, agency action. When the Forest Service sat down at the table in 1995 to consider what it would do about the question of baiting on national forests, it considered four alternative approaches. The first that it considered was to revert to its historical practice of using special use permits, issuing them and otherwise prohibiting the practice on national forests in Wyoming. That was the paradigm between the 1960s and the early 1990s. It rejected that approach. Second, it considered relying only on state regulations to regulate the practice. Under that approach, as it recognized at the time, no action would be required by the Forest Service. It also rejected that approach. It rejected it precisely because it would deprive the Forest Service of its opportunity to take action to protect federal interests such as grizzly bears. Sorry, you said no action would be taken, or no action would be required. You mean no regulation by the federal government would be required. But if they had chosen that one, do I understand correctly, you would still be calling that agency action? I think that one could see that as agency action. In the alternative analysis the agency did, there's a first alternative two, which I was describing just now, and also alternative four. I think it depends on what you look at as the status quo. At that moment in time, in 1995, when the agency was considering whether to adopt the national policy or take any of the other alternatives, the status quo at the time was that ban on baiting in Wyoming. No baiting was allowed. So to revert to that practice of allowing special use permits, that would have been not retaining the status quo at the time. Sorry, I was asking about option two. It was option two where they would do nothing and the states would be in control that I thought you said that wouldn't be action, but I think maybe I misunderstood what you meant because I think you would call that action, wouldn't you? I think that that would be action because at that moment in time when it considered the alternatives, the status quo was that there was a blanket ban in Wyoming on baiting. So it would have lifted that prohibition and reverted to its historical practice. So I don't think that it would have been agency action. Wait, you do or do not think? I'm sorry, I do not think that it would be agency. I'm sorry, it would be agency action because it would be reverting to that historical practice that was not in effect at the time because of the interim ban. I'm sorry, did I answer your question? Well, I think you said different things. Am I right that your position is that if they had chosen option two, that would count as agency action for review under the Endangered Species Act? Yes, I do think it would. Yes. And that's because once the agency has a policy that in some way restricts the activity, the decision to have no policy whatsoever, in your view, counts as action? I think it does. If you look at the situation on the ground in 1995 when the Forest Service considered these alternatives, a hunter seeking to use bait could not do so in Wyoming. It was prohibited from doing so by the blanket ban. Lifting that prohibition, reverting to its historical practice of issuing special use permits, that would have then allowed that hunter to obtain a special use permit. It changed the situation on the ground. Sorry, you're going back to option one, aren't you? Isn't it option one that had the special use permits and option two was not regulating? I think we're still asking about option two. I think option two is the one they didn't choose, so I would still like to hear three and four at some point. Of course. To be clear, alternative one was to revert to special use permits in Wyoming. Alternative two would be to rely purely on state regulation to regulate baiting on national forests. It would require nothing on the part of the Forest Service. The fourth alternative that the agency considered was to retain the status quo in 1995. It rejected that approach because it would leave in place the existing ban. It rejected that approach because it would not provide consistent national policy on the use of bait. It did none of those things. Instead, the Forest Service decided to lift its ban on baiting in Wyoming and to do something new, to authorize states to regulate the use of bait subject to mandatory federal oversight and safeguards, including closure orders if a conflict with ESA listed species ensued. So that was an affirmative and discretionary decision by the Forest Service to lift its ban and to authorize the states to regulate the practice. For the first time in history, it adopted that approach of this sort of concurrent jurisdiction, if you will, over the question of bait on national forests, where, yes, the states may in the first instance regulate the practice. They may authorize it, as Wyoming and Idaho have done. But it was always going to be subject now to federal oversight, to monitoring, mandatory monitoring, I would add, and to mandatory closure orders, if necessary, to protect. Hasn't that always been the situation? I mean, my understanding was that historically the states regulated hunting, but hunting on National Forest Service lands was always subject to the sovereign's prerogatives. Whether they decided to allow the states to provide the rules consistent with hunting on state property is one way of approaching it. But the discretion to regulate this, I thought, had always been there. Why is this a change in policy? So I think what differs from the national policy is that it adopted a framework. The Forest Service adopted this framework whereby there was a mandate to conduct monitoring, to watch the situation on the ground unfold, to see if federal intervention would be necessary to protect grizzlies or other federal interests, and to intervene. And it sets forth this framework that cabins the agency's discretion, what sort of factors would they consider in deciding whether a closure order was necessary. So in that context— Are you here today because you're upset that within this framework they have not taken what you call the new information and taken action within the framework, or are you saying something was wrong with the choice of this framework? No, to be clear, we're not challenging the national policy, the framework itself. Ultimately, we're taking issue with the fact that the Forest Service has not done what it said it would do under the national policy, which is to act to protect grizzlies as necessary when there are instances of grizzlies being shot. But when you talk about how there needs to be re-evaluation, like you're re-triggering the— Sorry, what is the word? Re-consultation. Thank you. Triggering re-consultation, would the re-consultation be to discuss the national policy? Because wasn't that what the consultation was about, what policy to adopt? And if you're re-initiating that, wouldn't we be back to reconsidering the policy? Because today now it sounds like you're talking about something within the policy instead of re-evaluating the policy. So I think what re-initiation of consultation would look like would be the Forest Service and the Fish and Wildlife Service sitting down for the first time since 1995 and considering what is the situation on the ground? Where are grizzlies present? Where is baiting allowed? And what is the effect of allowing baiting in those locations on grizzlies? So grizzlies are now present in locations where they were not present in 1995. But then based on that sitting down and thinking about all those things, would they then say, we need to have something other than the national policy? Or do you want them to say, within the policy, the bait is inconsistent with the forest plan or the state laws conflict with federal law as we now understand it or one of those provisions? So the outcome of consultation would not necessarily be a revision of the national policy. A consultation is a procedure between the action agency here at the Forest Service and the Fish and Wildlife Service to inquire whether this action that is taken, the national policy, whether that is likely to adversely affect grizzly bears. And if so, whether it's likely to jeopardize their continued existence. Now if the finding of the first question is affirmative and the finding of the second question is affirmative,  Do you want them to reconsider the national policy? We want them to consider the effects of the national policy and make sure that it's still consistent with the Endangered Species Act. Because if it is not, then it cannot be allowed to continue. We don't know whether it's consistent or not. The fact is that the agencies have not looked at this question since 1995 and so much has changed since then in terms of where grizzlies are present. In order to have standing, there has to be some potential for some concrete action that will be taken at the end of this case if you win. Right? And I think you've now said that the concrete action would be revisiting the national policy and putting in place some restrictions that do not exist and cannot exist within the current framework of the national policy. Is that right? Yeah. So for purposes of, certainly for purposes of standing, that is I think the inquiry. Whether there is a possibility that the agency would reach a different outcome had it complied with the procedures required by law. And here those procedures are reinitiation of consultation. So certainly the outcome could be that there is a finding that the national policy is likely to adversely affect grizzlies on account of where grizzlies are now present, the wider geographic distribution of grizzlies, and instances of grizzlies actually being shot over bait, which the Fish and Wildlife Service considered only a remote possibility of occurring at the time. So going, I mean, you only get to the re-consultation requirement if, among other things, the 1995 policy was action that triggered consultation in the first place. Right? And so going back to that question, how do you reconcile your view that this was action with our decision in Matejko? Yes, Your Honor. I think that Matejko is actually very instructive for this court for all the reasons that is distinguishable here. So in Matejko, as the court is aware, this court held that BLM's acquiescence to stream diversions on land that BLM managed was not agency action, because there the private parties had held vested rights of way under an 1866 law, and there BLM did not change regulatory frameworks concerning that activity. It did not issue an interim blanket ban, any sort of ban as the Forest Service had done here between 1993 and 1995. It did not issue closure orders. It did not wait for a state to adopt regulations that it then deemed sufficient before in fact transferring that permitting authority and relinquishing it and allowing states to regulate in its stead, as the Forest Service has done here. And BLM had made no commitment to monitoring the status quo on the ground, the situation on the ground. Counsel, we emphasized time and again in Matejko that it requires some kind of affirmative action. So what, in your view, is the affirmative action that was taken in 1995? I think the affirmative action the Forest Service took in 1995 was to lift its ban on baiting in Wyoming and to authorize states, to affirmatively authorize states to regulate this practice. In 1994, states could not have, because that ban was in effect. And they were affirmatively authorizing? What in the law suggests that the Forest Service has to authorize this? In 1994, prior to the national policy being adopted, Wyoming could not have regulated specifically the practice of baiting because there was a blanket ban in effect on national forests in Wyoming. Yeah, but that's just Wyoming. That's true. It's not true of Idaho. That's true, Your Honor. I don't think that that in any way diminishes it being agency action, though. Certainly, even if it was only a subset of Wyoming. The fact is there was an area at the time where the practice was prohibited, and the Forest Service lifted that ban in 1995, and I think that that itself constitutes agency action. But with respect, for example, with respect to Idaho, from Idaho's perspective, there was nothing that the Forest Service did. Nothing changed anything. So I think it actually did change with respect to Idaho as well because it adopted this new framework where there was federal oversight, an obligation to monitor the practice, and to issue closure orders as necessary to protect federal interests like grizzly bears. So I think for two separate reasons, I think there was agency action in 1985. And the framework itself is agency action, even if the agency never does anything under the framework. I think that's correct, Your Honor, and that's why we're here, because it didn't do anything under the framework. There have been instances of grizzlies being shot over bait, and the Forest Service has, in fact, not re-initiated consultation as it was contemplated in 1995 that it would do. And I was going to ask, the second point you made as to why it's action, the sort of continued oversight and possibility of closure orders and all that, that's not really essential to your view of why it's action, because in answer to Judge Friedland's question at the very beginning, you said that if they had just done nothing at all, or if they had said we were going to have zero policy, that that would still be action, right? So the ongoing monitoring and potential for ongoing oversight of what the states are doing is, in your view, not really a factor that makes it action, or not a necessary one. No, if I said it quite that way, I apologize. To be clear, if the Forest Service had truly done nothing, if there had not been a lifting of a ban, if there had been no ban in effect, no lifting of a ban, no framework for monitoring and intervention as necessary to protect grizzly bears, well, I think that would be an entirely different case. That would look a lot more like Matejko at that point. Well, and so that suggests then that Matejko would have come out differently if before the BLM policy there, that there had been some different BLM policy. Is that right? I think that would be a different case, certainly. I think Matejko, the outcome in Matejko turned in part on the fact that there was no history of a change in regulation. BLM had not regulated those diversions. It had not monitored them. It had not committed itself to monitoring them. It had not adopted the framework for managing them or issuing any kind of order to effecting the underlying activity, the diversions in that case. I think for all those reasons, Matejko is the paradigmatic case in the circuit of agency action, for all those reasons, everything the BLM did not do there. Can I ask you about the new information? So let's say you get past this issue and there is agency action. Let's just hypothesize that for a moment. What is the new information that triggers the reconsultation duty here? Because it doesn't seem like one new bear being born could be enough. So what causes something to be enough to be new information? So I think I would actually push back a little bit on the notion that one bear being shot is not enough. I think that it actually could be. No, I said one bear being born. I mean, it can't just be any fact in the world that happens. So what is it that is enough information here? Certainly. So a few things. First of all, the first bear to reach the Bitterroot Ecosystem since 1946, and the Fish and Wildlife Service has recognized the importance, the critical importance of the Bitterroot Ecosystem to the recovery of the species, that it really cannot meaningfully occur without a robust population in the Bitterroot Ecosystem. The first grizzly to reach that ecosystem since 1946 was shot over bait. I think that itself is new information. The agencies did not consider that that was a likely possibility at the time. It was any instance of... Well, they did anticipate that it is possible that baiting could cause a grizzly bear to be shot. And they understood that that would require initiation of consultation. They considered a remote possibility of it occurring, and they understood that that would then require initiation of consultation. So it's that. It's the fact that there have been instances of grizzlies being shot. There are two undisputed in the record. It does seem like the policy, some of the language said that. So it is interesting, because they did say, if a grizzly bear is shot, that would trigger reconsultation. That hasn't happened, I gather. But I didn't understand your lawsuit to be coming here and saying the national policy hasn't been implemented the way it was intended. Instead, it seemed like you were saying we need to have consultation again about the national policy itself. But maybe you're shifting that today. No, I don't think that we're shifting it. I think it's two different ways of looking at the same question. It's whether what has happened since 1995 in terms of grizzlies, in fact, being shot over bait, whether the expanded range of grizzlies since then, whether that constitutes new information requiring re-initiation of consultation. So the fact that there has not been re-initiation of consultation, that is, in a sense, the gravamen of our lawsuit. It's seeking to compel re-initiation of consultation as it's required. Okay. The whole goal here of the Endangered Species Act is to help the grizzly bears do better, right? So the policy is trying to have a system that will help them do better. They're doing better. They're expanding in their territory. So now you say, okay, they're in more territory. That's new information. We need re-consultation. If you get your re-consultation, then a year from now when they're doing even better, do you think they need to re-consult again? Is it just all the time, endless? What is the limit here of this new information duty? I think if the agencies re-initiate consultation, as was required by the Endangered Species Act, and they consider the current trajectory of the population, they consider the fact that baiting is now allowed in Idaho and Wyoming and that grizzlies are, in fact, being shot over bait in those states, if that continues to occur, I don't know that that would be new information anymore in the future. The fact is that it was not considered likely at the time in 1995. There was no projection forward of, you know, we anticipate the population will expand to these areas where they were not present historically. So it is new information now, and what may be new information in the future is somewhat speculative. But I think it's absolutely a... It animates the question of what the agency would consider when it re-initiates consultation. Council, what effect, if any, are we supposed to give to the Forest Service determination that it was not agency action in 1995 and its request to Fish and Wildlife that it withdraw its letters from 1995 and Fish and Wildlife's acquiescence in that? I see that I'm out of time. May I briefly answer? Keep answering the questions as long as we're still asking. Thank you. So the district court didn't reach the question of whether the rescission decision was lawful, and I think that, you know, there would need to be a proceeding on that question. I don't think that... I mean, it is ultimately the same question of whether or not there's agency action because of the justification that the Forest Service... Right. Do we have any duty to defer here? And it's interesting because we have two agencies that have agreed on this. It does feel a little collusive, so I'm sure we'll have some questions for the government here. But what effect are we supposed to give this when Fish and Wildlife also concludes that there was no agency action and is willing to withdraw its letters? So I would emphasize that it was a determination made after litigation was filed and that I believe the post hoc rationalization, as the district court found, I don't think it is entitled to deference for that reason, that it was a post hoc rationalization adopted in the context of litigation. And it's ultimately the legal question before the court, whether there was agency action. I don't think that the court owes any deference to the agency in answering that legal question, which is ultimately the question of this case before the court. And if, okay, if you can get past the idea that this was agency action and then there's this new information question, do you think we should figure out if there's new information or should that be remanded to the district court because the district court never considered it? What do you think is supposed to happen if you get that far? So I think that the appropriate outcome, if your Honor rules in our favor, is that the district court's decision be set aside and the agencies be ordered to re-initiate consultation and to evaluate the new information under the Endangered Species Act and see whether it rises to the level that now it's likely to adversely affect determination or potentially a jeopardy of determination. Those are questions that are committed to the Fish and Wildlife Service by law. But I think that whether there's new information here, I think that it's properly before this court to answer. Okay, we've taken you over your time, but I'll still give you three minutes for rebuttal, so let's hear from the other side. Good morning, Your Honors. Amy Collier on behalf of the federal defendants. With me at council table is Travis Jordan for the state of Wyoming and Owen Maroney for the state of Idaho. I plan to speak for 15 minutes and reserve five minutes for Mr. Jordan. So as this court has recognized, Section 7 of the Endangered Species Act requires federal agencies to ensure that any action they authorize, fund, or carry out will not jeopardize a listed species. This court has recognized in Karuk Tribe that this Section 7 consultation duty arises only when an agency affirmatively authorizes, funds, or carries out the underlying activity. Section 7 reflects Congress's concern about agencies creating collateral effects to listed species by actions that they affirmatively undertake. As this court has recognized in Matejko, it does not apply to agency inaction, it does not apply to unexercised authority to act, and it does not apply to the actions of nonfederal actors. But really, that is all that appellants challenge here today, the Forest Service's policy of not regulating a hunting practice, specifically the placement of bait to hunt any resident game on Forest Service land, and instead letting states carry out their traditional role of regulating hunting practices within their borders. In Matejko, there was no regulation of these waterways, and then the agency basically announces, we're just going to continue not regulating these waterways. Here, the other side at least is saying, you had closure orders, and then now you announce a policy where you won't have closure orders, so there's actually a difference, and that makes this not controlled by Matejko. What is your response to that? Certainly. I think there's a little bit of confusion about what the state of the policy or the Forest Service's activity was before 1995. In every state except Wyoming, the Forest Service permitted states to decide whether or not to regulate the placement of bait, including the placement of bait for black bear hunting. The Forest Service's regulations since the early 1980s have exempted non-commercial hunting activities from any requirement to obtain a special use permit. That might be a good argument that in Idaho, we're under Matejko, but Wyoming is part of this. Certainly. Why isn't the change in Wyoming enough to be different than Matejko? I think the clarification here is that it was not necessarily a statewide rule in Wyoming  somebody needed a special use permit. It was some forests in Wyoming that were requiring special use permits. And then as the Forest Service realized this was inconsistent with its regulations, it decided to bring Wyoming into line and there were a number of cases filed against the Forest Service, during which time they implemented these sort of prohibitions pending the development of a policy. First, it was Region 2 in Wyoming just for black bear baiting and then more broadly for the development of the national policy, which would apply more broadly. It sounds like you're saying, I mean, it's a little unclear what the status quo was, but we have a period of special use permits. Then we have a period of closures, which I think you just sort of blamed on litigation. But either way, there was federal regulation and after this national policy, there is not. Correct? Correct. I mean, I would say that, you know, it was a spotty regulation beforehand in Wyoming, but I think it's important to, again, to go back to the statute itself. The statute in Congress was clear that the Section 7 consultation duty does not apply to any time an agency takes any sort of action. It doesn't apply to any sort of decision made by the agency. It applies to actions that the agency authorizes funds and carries out. So how do you distinguish Environmental Defense Center versus Bureau of Ocean Energy Management? Certainly. So in that case, I think the context was entirely different. That was a series of oil leases in the Outer Continental Shelf in an area that the federal government exclusively regulates and that Congress has directed the federal government to regulate and the agencies have set up these regulatory schemes with a very detailed four-part leasing program from leasing to development or production to development. And so in that case, the agency had already issued leases to these entities and it was deciding whether or not to allow a new type of technology on leases that it was already issuing and regulating. And so I think the distinction... Basically, as I understand it, the agency was saying, we're not going to regulate fracking. Isn't that case, the premise of it is the agency is announcing it will not regulate? I think the way this court framed it in that case particularly was that it was the agency approving this technology and approving this technology on its leases. So I don't think it was just the agency saying it wasn't going to regulate it at all. The agency itself, I think, defined this as a decision support tool for future proposals and the court itself characterized this as the agency approving a particular type of technology on these existing leases. And just to step back again, as this court has routinely recognized, states have the right and the obligation and the responsibility to regulate wild animals and hunting practices within their borders. And as this court recognized just last year in CBD versus USFS, that right tends to exist unless the federal government decides to step in to preempt state regulations, which it rarely does. I think this is an example. And of course, in that case, the court recognized that the Forest Service has authority, it can step in if there's some conflict with federal law, but that it rarely does so. And I think the national policy is consistent with that sort of existing regulatory scheme, which is quite distinguishable from what you have in the BOEM case. So just to step back a little bit and talk about what the states do. So as the statute says, the federal government has, or federal agency has to consult if it authorizes, which is relevant in this case, authorizes the underlying activity. How it stands today, states are the ones that authorize the underlying activity. States decide whether or not hunters may use bait when they go out and hunt. They issue regulations and permits and licenses. They decide where, when, and how hunters may play as bait when they are going out and doing that activity. Since the national policy was adopted in 1995, some states, including Idaho and Wyoming, have continued to allow the practice. Some states have decided to outlaw the practice, and there are at least a couple states that now prohibit it since the national policy was issued. And I think that just sort of underscores that it's not the federal government authorizing this activity. It really is the states that are doing that. I mean, is that just sort of question begging though? Because if the baseline was that in Wyoming before the federal government was regulating the policy, stopping that is a way of saying, I'm sorry, I think I said the wrong word. Before in Wyoming, they were allowing, they were stopping baiting by regulating the practice. After this national policy in Wyoming, baiting is allowed. So you could call it the state is letting them, but by letting the state let them, isn't the federal government letting them too? I mean, I think to push back on that, I mean, if Wyoming decided to prohibit black bear baiting within their borders, the federal government, the national policy wouldn't be authorizing anything. Again, it comes down to what the state decides to do and whether to authorize that practice. And you think the change from taking an active role as the federal government to not is not a change that counts as? I think that you have to look at what the change says. You have to look at what the national policy says. It can't just be that an agency change in position or a statement itself automatically constitutes section seven action. I think you have to look at what the policy says. And here the policy says we are reaffirming that states have the role of regulating hunting practices. We're retaining the longstanding tradition that states will regulate this. It is really hearkening back to this overarching concept that states are the ones that will regulate hunting practices. And why do you think, again, that that wasn't a change in Wyoming? I mean, so a number of reasons. But first of all, again, I'd push back on just the fact that there is a change. You have to look at whether the federal government, whether the federal agency is authorizing the underlying activity. So a change doesn't necessarily mean that the agency itself is authorizing that underlying activity. It can't be that just any time the agency slightly changes its position, if it is not authorizing anything or it's not regulating anything, and it's deciding to step back and not be the one regulating that process, that it becomes a section seven action that requires consultation. And so I think that, you know, that's... I mean, they stop prohibiting, but that doesn't count as authorizing. I don't think so, just given the overarching fact that the states are the ones authorizing this practice. I would also point the court's attention to the D.C. Circuit Decision and Fund for Animals, which is another circuit court that has looked specifically at this national policy. And it held, you know, just a couple years after it was issued that this was the Forest Service refraining from regulating and implementing the longstanding policy of deferring to state law. Under the Endangered Species Act, there's no holding about this. There's a hint that they agree with you, but there's not a holding, right? That's correct. There's no holding specifically that it's not agency action, but I think that is helpful, sort of, just to characterize what the nature of what the Forest Service was doing in saying that it's implementing this longstanding practice and refraining from regulating. And the court did suggest that it might not be agency action under NEPA because it was implementing this longstanding policy. And then under the ESA, it explained, you know, if it is this sort of inaction, it might not be Section 7 action either. But the longstanding policy of refraining from regulating was not the longstanding policy in Wyoming. Again, I think I would push back a little bit on the fact that the Forest Service had a longstanding policy of regulating baiting in Wyoming. Hunters were able to hunt with bait in Wyoming before the Forest Service was even established. And Congress has again and again recognized in federal statutes that states retain responsibility and jurisdiction over hunting practices. So the fact that there were some forests in Wyoming that were requiring special use permits, I think, is not necessarily indicative of the fact that there was a significant change in what the Forest Service was doing. Can I ask you, if we don't agree with you on this issue and they went on whether this is agency action, what do you have to say about the new information issue? Certainly. So a couple of points. First, I do think the fact that there is no consultation on the books right now means that there's nothing for the agencies to re-initiate. So that issue would have to be addressed. Let's say you lose on that. In terms of re-initiate, so that is my reasoning for why we did not brief the issue of new information because there is no existing consultation. In terms of the new information that appellants have raised today, I first want to address the Court's two questions. So in the order last week, the Court asked if there was any criteria that governs what is new information. From my understanding, there's no specific guidance on criteria other than what's in the regulation itself. But the regulation itself doesn't say, as Your Honor has recognized, doesn't say that any new information constitutes enough to be the trigger for re-initiation of consultation. It's only new information that reveals effects of the action that may affect listed species in a manner or to an extent not previously considered. And so the two sort of buckets that appellants have raised here today are one, that there have been at least a couple of takes of grizzly bears over bait sites on national forest lands. But the only examples that they cite are from 2007 or earlier. And they filed this lawsuit in 2019, well beyond the six-year statute of limitations for any sort of take in that context to be a trigger for re-initiation under the ESA. Do you argue that statute of limitations argument in the District Court? We put it in a footnote in one of our briefs, but we did not argue it affirmatively. Again, based on the position that there is no consultation to re-initiate. Is there no consultation because the Forest Service asked the Fish and Wildlife Service to withdraw the letters? That's correct. There clearly was some kind of consultation in 1995 in that period. Yes, that's correct. Okay, so I mean, there clearly was some kind of consultation. At least in 1995, it appears that the Forest Service thought that it had an obligation to go to Fish and Wildlife. That's correct, Your Honor, and it's a little unclear in the record whether that stemmed from the Forest Service's agreements and sort of the stays of the litigation as they were deciding to enact this national policy and they agreed to conduct an EBA and ESA. But I would point the Court's attention specifically to the letters that the Forest Service and Fish and Wildlife exchanged in 2020, which states where the Forest Service was citing intervening case law, including Fund for Animals and Matejko, to sort of play out the fact that, you know, while we consulted in 1995, it is clear looking back at it now, based on this intervening case law, that this was inaction. That inaction also follows the filing of the lawsuit in 2019. That's correct. So it looks very collusive and it looks like it may be litigation. Well, I think the reason that the agencies did it was because there is this confusion about whether the national policy is in action, and this would be a continuing confusion if the agencies allowed this consultation to remain on the books. I don't think it was collusive. I think it, you know, it brought to the agency's attention that there was this national policy consultation and that it wasn't appropriate giving the standards under the ESA and the intervening case law. So if the plaintiffs were right that the 95 policy was in action and they now have what they say is new information that triggers reconsultation, what should they be doing at this point? I mean, should they have pursued a challenge to the 2020 withdrawal of the consultation documents? Or is there, what is the appropriate vehicle to bring that kind of challenge? Certainly. So, and I see I'm out of time, but I'm going to continue answering. So, and they did amend their complaint in the district court to add a challenge to that decision to withdraw the consultation document.  for challenging that decision and challenging the lack of consultation. Do you think, I mean, obviously you would disagree with that on the merits, but is there, I mean, is that an appropriate challenge for somebody to bring at this point? If, you know, if they have an argument that the old policy really was something that triggered consultation, can they now come in and say, based on that you can't withdraw the consultation documents? Is that a valid procedural? I think there would be, you know, you have to look and see if there are any sort of jurisdictional issues with that. But we have not briefed that because that isn't before the court. But I think that would, you know, the question of whether that withdrawal decision was reasonable or arbitrary in some capacity might be a vehicle. I did want to really quickly touch on the new information about expanded range. So again, the statute itself talks about, or the regulation itself talks about new information that reveals effects of the action on the species. Appellants cite no case that holds that a species expanded range. The fact that a species is doing really well is revealing new effects of the action that weren't previously considered. The only example they cite is a case where the species range was actually contracting. And if you just think about the fact that, you know, if a species range is contracting in the face of the agency action, that could be revealing some effects of the action that weren't considered. I don't think that standing alone, the fact that a species range is improving and expanding without citing some sort of effect on the species is sufficient to trigger that new information requirement. So I was looking at my notes trying to find the page reference, and unfortunately I can't find it. But there's something in the announcement of the policy that says we don't really anticipate that grizzly bears will be killed. We know it's a possibility, but we don't really anticipate it. And there is something that says if we do get information that there is taking, that we will re-initiate consultation. Do you know what I'm talking about? I'm having trouble finding the page. But what does it say about why that hasn't happened? And I don't have that in front of me, and I want to be clear that there's a distinction here between whether the agencies could consider that pre-2007 information in deciding whether they want to re-initiate consultation versus appellants bringing a claim 12 years after it occurred as an APA challenge, saying that that's the trigger for re-initiation. And this court has held that the statute of limitations applies to ESA consultations in the first instance. It's not a continuing obligation in the sense that there has to be some trigger, and the case has to be brought within those six years, and that's the CBD versus EPA case. But if we... I feel like there's confusion here about whether they're actually asking for new national policy or some problem within the national policy. But if we take them to be arguing that this national policy... Like, okay, one thing they could be saying is, okay, the national policy said, if there's taking of a bear, that's going to re-initiate. They didn't do that in time, maybe. But maybe they can still say, look, this whole national policy somehow isn't working because this has happened and nothing happened. Yeah, and I would submit that that is not an argument they have made at all throughout this case. Their argument has been that there is new information that requires the agencies to re-initiate consultation on the national policy. And a consultation on the national policy... So it was maybe too late for them to come in and say, look, your national policy said if a bear is killed, you're going to do something within the national policy. They've missed that chance, I guess. But if we step back and now they're saying the new information as a whole makes you reconsider the national policy, and part of what we take into account is the fact that you didn't do what you said you were going to do in the national policy. Sure, but I think the outcome of a new consultation would be the agencies looking at what the policy says and determining whether there needs to be any new mitigation measures in place for the policy. It's not necessarily going into the policy itself and saying you're not doing that unless there were mitigation measures that were in there that weren't carried out. I think we're getting down into what the agencies might do down the future if they were to re-initiate a consultation, which we just don't have a record on. But what they've maintained throughout this case is that there needs to be re-initiation so that the agencies can consider whether there are effects of the national policy that weren't previously considered. And do you think that issue is before us such that if we agreed with you on that, that would be all we would need to decide? We could just say, regardless of whether it's agency action, there's no new information, so they don't win. I think the court could affirm on any basis supported by the record. And while we didn't fully brief that, I think the court could do that. I don't know necessarily if that would resolve all of the issues in this case, but that is certainly possible for this specific litigation. And you don't think we would need to remand to the district court or something about that, or it would be okay for us to just do that? I think that would be fine. I think we're taking over your time. We still have five minutes. May it please the court, Counsel Travis Jordan for the state of Wyoming with me here today, as mentioned earlier, as Mr. Moroney for the state of Idaho. Unless otherwise directed, I want to offer some clarifications to some of the factual timeline that occurred here and then speak to new information. Judge Friedland, you had mentioned there's a portion that you had read. If there's an incident, I'll take a zero, that reinitiation would happen. That was in the 1993 biological opinion that accompanied the Wyoming-specific policy. That was at SCR 164. That policy was rescinded that same year and was two years before the national policy challenged a case in this case. You relied on and adopting this policy, right? Your Honor, the concurrence letter says we will adopt the management criteria for Wyoming for a biological opinion. It did not adopt the ITS, the incidental take statement. So those two management criteria, if you look at the concurrence letter that occurred in 1995, it said that the Forest Service is going to encourage the state of Wyoming to disclude or prohibit baiting in wilderness areas as well as making sure that game and fish personnel remove a black bear bait if a grizzly bear is present at it. So the concurrence recognized the mitigation measures but didn't carry over the biop. And below, and mentioned briefly in the briefing in this case, the state of Wyoming took the position that the 1993 biological opinion is no longer operable because the underlying policy was rescinded expressly by the Forest Service before 1994. And as my colleague mentioned, there was a blanket ban during the 1994 interim period until the 1995 policy was enacted. And that understanding, Your Honor, is consistent with this court's affirmance in Wild Equity Institute where it said a previous biological opinion carries no weight if the decision no longer exists. One other thing on the timeline, Your Honor, opposing counsel had suggested that the Forest Service has regulated hunting in Wyoming since the 1960s through special use permits, and that's disingenuous and also not consistent with the record. That reference is at SER page 87. The Forest Service used special use permits to regulate baiting in Wyoming for sanitation and litter purposes. It couldn't have done it to prohibit potential injuries to grizzly bears because grizzly bears weren't even listed under the Endangered Species Act until 1975. That evidence in the record is belayed and supported in 1980 at SER 68 and SER 95 where the Forest Service was expressing concerns with resource conflicts with black bear baits, not its intention to regulate hunting itself. Your Honor, none of us would want to recreate near a black bear bait site, and Wyoming regulations or anything Wyoming could do couldn't fix that on the Forest Service. It was up to the Forest Service itself to regulate those resource conflicts. But then we get into the 1990s, and as grizzly bears started to move out of Yellowstone National Park outside of the primary conservation area and then into the demographic monitoring area, we started to see these resource conflicts, and that's when Wyoming started to bring its regulations forward to ensure that it would prohibit baiting in high-traffic areas as well as regulate the practice of what goes in the bait and what can be done during the baiting season. With that, I'll just move briefly... I'm not sure I understood what you were just saying. You're saying the federal government could not have done more regulation? Is that what you're trying to say? No, no, no, Your Honor. The purpose of the special use permits were to address litter. And in fact, the Forest Service, as my colleague mentioned, from the federal government, moved away from special use permits actually in 1984. The Forest Service was intending to address litter concerns. But I thought that in Wyoming there were special use permits until, like, 1992 or 1993. So in 1992, there was a bear hunting season with partial closures. Those were closure orders. The actual 1993, there was the interim policy, which was subject to litigation. In 1994, you had the full ban. Whether or not there were special use permits for non-commercial hunting, that doesn't seem indicated in the record. There have been some past where guided outfitters and guides may have had to get their special use permit. But in any event, there were closure orders in Wyoming leading up to 1995. So that is the federal government regulating? Yes, Your Honor. 1994 was in direct response to litigation in a court order. And then the closure order in 1992 was partial, as my colleague mentioned, as well as 1993, where they felt there were still resource conflicts with recreationalists and campsites and such. So it was just a blanket ban saying, we don't want you doing in these particular sections the Bridger-Teton of Shoshone National Forest. And did the closure orders actually continue for a while after 1995? They ended in 1998, and that was after Wyoming regulation finally prohibited the use of bait in all wilderness areas. So we're talking about 3 million acres in Wyoming that are prohibited from baiting of Forest Service lands where there's no baiting occurring at all. And so once the Forest Service, consistent with the policy, recognized that state regulation was adequate, it lifted its closure orders. So we haven't had a closure order in effect in Wyoming since 1998. What I was a little bit confused about, though, is I thought the national policy said, basically, we're not going to do closure orders anymore. But it seems like one was still in effect for a little while, for three more years. Your Honor, I'd look at SCR 65 and 66. And really the national policy is, we recognize states regulate hunting practices. If there's an issue, our first step is to consult and coordinate with the states where there might be an issue and get them to change the regulations if we can. The final step is to go through the closure order process. So if the Forest Service can't manage these resource conflicts effectively with state cooperation, they still have that opportunity. Do you think that's what happened between 1995 and 1998? I think it was partly a transition period. 1998, it took some time for the Game and Fish Commission to satisfy the conditions of the Forest Service in making sure all of those wilderness areas were prohibited from potential baiting in the state of Wyoming. And I'll just note the record site where that conversation, that was at SCR 59, where the Forest Service has the dialogue of why it removed the closure order for Wyoming. I've run over my time, and so I would just like to make a final conclusion. My colleague had mentioned that really the agency is here being punished for success with respect to new information. The intent of grizzly bear recovery is to see grizzly bears expand in population and expand in their habitat. It's a hard stretch to suggest that grizzly bear success is a reason for reinitiating consultation under the definition of new information. And accordingly, the states of Wyoming and Idaho would respectfully request this court to affirm. Your Honors, I'd like to briefly address a couple of points that were raised by my friends on the other side. First of all, again, when the Forest Service sat down at the table in 1995, when it considered the alternatives set forth in the record, Alternatives 1 through 4, it considered this is Alternative 2. It considered relying only on state regulations to regulate baiting on national forests. I think that's what my friends on the other side characterized what it in fact did do. It is not. It rejected that alternative. Instead, it adopted this framework of monitoring the practice, mandating the monitoring of the practice, and to intervene as necessary to protect grizzlies and other federal interests. So it wasn't just taking a step back and allowing states to regulate in its stead. It was a framework of concurrent jurisdiction between the federal and state governments. And there's nothing unusual about that. So certainly it's true that in Wyoming and in Idaho, the states do issue the licenses to allow the practice. They issue the licenses for baiting. But that's not to the exclusion of federal involvement. And there's nothing unusual about that. As the Supreme Court recognized in... And so, I mean, why isn't it too late for you to use the 2007 takes of these bears to be here today? A couple points in response to that. First of all, under this court's framework for evaluating statutes of limitations, when there's inaction, that's an evergreen, as this court has stated, cause of action when you're challenging inaction, which we do here. It's the failure to initiate consultation that is in the nature of a claim challenging inaction by the government. So that is an evergreen cause of action that could be brought at any point. And I think more importantly, we didn't learn about, and my clients did not learn about those instances of grizzly take until 2019 when we filed this lawsuit. And that's because the Forest Service did not do what it said it would do under the national policy. So your friend on the other side said they didn't really say that. They said that in some earlier document, not this one. Do you have a response to that? I'm sorry, Your Honor. The argument that one of these documents says that if there is a take of a grizzly bear, we'll reinitiate consultation. He says that was not the relevant documents. Do you agree with that? To clarify, that was at ER 164, and that is the 1993 biop on the Wyoming policy, as my friend on the other side acknowledged. I think that it's clear that the agency has contemplated that the guidelines and the restrictions of the 1993 biop would be carried forward and be applied to the national policy. I understand that my friends on the other side disagree with that view of things. I think it's ultimately actually not necessary to answer that question, though, because here it's not just the incidental take of those grizzlies. It's not that we're seeking to enforce that incidental take statement of the Wyoming biop. It's that the instances of grizzlies being shot is itself new information, which is a separate regulatory trigger under the regulations for reinitiation of consultation. And it's not just those instances of grizzlies being shot. I see that I'm out of time, Your Honor. May I briefly finish? Finish your thought. It's also the expanded range again. And the bitterroot ecosystem is a vital important survival of the species, the recovery of the species. There's no grizzly population there, and grizzlies being shot on the path to the bitterroot ecosystem is new information that would require reinitiation of consultation, Your Honors. Thank you. Thank you, both sides, for the helpful arguments. This case is submitted, and we're adjourned for the day. All rise.
judges: BYBEE, FRIEDLAND, MILLER